Annetta K. Lerch, Appellant, *v.* George W. Bard, Samuel H. Kutz and Regina Boyer, trading under the Name, Style and Title of American Plumbago Mining Company.

*Practice, C. P.—Charge of court—Unfair charge.*

The Supreme Court will reverse a judgment on a verdict for defendants where the court below takes up and refers to six items of evidence adduced by defendants and prominently presents them to the jury for their consideration in determining the main fact on which the case turns, without presenting to the jury competent evidence given by the plaintiff tending directly to contradict the evidence of defendants to establish four of the six alleged facts, and frequent declarations to the jury that all the evidence is for their consideration does not cure such instruction.

*Partnership—Authority of manager—Revocation of authority.*

Where a manager of a partnership business has had authority to borrow money for the partnership, mere notice by one partner acting independently of the others is not sufficient to revoke the long exercised power of the manager.

*Evidence—Partnership note—Attorney at law.*

In an action upon a partnership note signed by the manager of the partnership business, evidence that the manager was counsel for the plaintiff in the adjudication of her father's estate in the orphans' court is immaterial and irrelevant.

Argued March 2, 1896. Appeal, No. 116, July T., 1895, by plaintiff, from judgment of C. P. Berks Co., Feb. T., 1892,

No. 51, on verdict for defendants.  Before GREEN, McCOLLUM, MITCHELL, DEAN and FELL, JJ.  Reversed.

Assumpsit upon a promissory note.  Before ENDLICH, J.

At the trial it appeared that the note sued upon was as follows :

"$3000.        READING, Pa., October 1, 1890.

" One year after date we promise to pay to the order of Annetta K. Lerch, Three Thousand Dollars at lawful interest, without defalcation.  Value received.

" AMERICAN PLUMBAGO MINING CO.,
" WILLIAM P. BARD, Manager."

The evidence tended to show that William P. Bard was defendants' manager with power to borrow money and sign promissory notes.  Plaintiff gave to Bard $8,000 for investment. Subsequently Bard disappeared.  The plaintiff went to his office and found a large envelope marked in Bard's handwriting with her name, containing a bond and mortgage of Rehr & Fricker for $5,000, and the note in suit for $3,000.  The court admitted evidence, under objection and exception, that William P. Bard had acted as plaintiff's attorney upon the adjudication of her husband's estate in the orphans' court.  (4) Other facts appear by the opinion of the Supreme Court.  A former appeal is reported in 162 Pa. 307.

The court charged as follows :

By articles of agreement dated May 24, 1888, the defendants formed a copartnership, as the " American Plumbago Mining Co."  They constituted one William P. Bard their manager. This William P. Bard was also a practicing attorney in Reading.  He kept two accounts at the Farmers' Bank, one as manager of the American Plumbago Mining Co., and the other as attorney.  On October 4, 1890, the executor of the plaintiff's deceased husband, by direction of the plaintiff, handed to William P. Bard two checks drawn to the order of the plaintiff, one for $5,000 and one for $3,000.  Both of these checks were subsequently indorsed by the plaintiff and returned to Bard's hands, the money to be invested by him for her.  He invested $5,000 in certain securities which have been described to you in evidence, and which remained in his hands as plaintiff's attor-

ney. He also informed the plaintiff that he had invested the balance of $3,000, and subsequently paid to her quarterly the interest on the same.

On November 4, 1891, Bard disappeared, and some days later his body was found in the Schuylkill river. Subsequently to his disappearance, there was found in the vault of his office, in pigeon hole " L," a large envelope indorsed in Bard's handwriting with the name of the plaintiff, containing, besides the securities in which the $5,000 I have already referred to were invested and some other papers belonging to her, the note in suit in this case. The defendants declining to pay the note, you are now called upon to declare whether they are liable to pay it or not.

The evidence adduced in this trial has been explained and discussed to you by counsel in all its bearings, and I shall not attempt to rehearse it to you. It is your duty to remember it, and, upon every question that you will have to decide, to bear in mind the whole of it and to come to your conclusions in the light of the whole of it and according to the fair preponderance of it on the one side or the other. I shall confine myself to stating to you the legal rules which it is your duty to apply in your investigation. The first question that arises is, had Bard the power to make and deliver this note so as to bind the defendants to its payment? " One who employs an attorney to invest money is bound by the knowledge and acts of the attorney and therefore if the jury find that William P. Bard received this money as the plaintiff's attorney to invest for her, then the plaintiff is bound by all the knowledge which William P. Bard had of his power or want of power to borrow money for the partnership and by his good or bad faith in the transaction."

The provision in the defendants' articles of copartnership is as follows : "It is hereby further understood and agreed that no debts shall be contracted in the name of the American Plumago Mining Company unless the written consent of all the parties hereto be first had and obtained.

"It is hereby further understood and agreed that William P. Bard, of the city of Reading aforesaid, shall be the manager of said copartnership or company, and shall have the general management of the said business, and he shall be authorized to sign all notes, checks, drafts, and other obligations, and to exe-

cute all papers under seal or otherwise, necessary for conducting said business and for the purpose of carrying out the provisions of this agreement."

You must, however, consider this provision in connection with the evidence as to the practice of the parties under it. Courts will in general accept that construction of a contract which the parties to it themselves put upon it. The plaintiff contends, under the evidence upon this subject, that Bard had unlimited and general power to give notes in the partnership name, to borrow money on account of the partnership and to give notes in its name binding it for the repayment of such money. The defendants contend that while he had the right to order supplies and the like and in payment give notes of the company for their price, when it came to the question of borrowing money the consent of all the partners was required in order to enable him to do so. Now, gentlemen, you will remember what the evidence upon this point is and you will determine what it proves.

"The jury may find from the written agreement of copartnership together with the parties' course of dealing thereunder, that it was the intent of the parties to invest William P. Bard, their manager, with power at his discretion to borrow money for the copartnership and to give the copartnership note therefor." But, "If the jury find that it was not the intent of the defendants to invest William P. Bard, their manager, with power at his discretion to borrow money for the partnership without consulting the defendants, and that this note was made without the knowledge or consent of the defendants, then the verdict must be for the defendants." And, "Even though William P. Bard had originally possessed authority to borrow money for the partnership, without consulting the partners, yet if the jury believe that in the summer of 1890 George W. Bard, one of the partners, informed William P. Bard that he was not willing to be under any liability any longer for money borrowed for the firm and took up all the outstanding loans, then the defendants would not be liable for money borrowed afterwards from the plaintiff through William P. Bard as her attorney, without the knowledge of George W. Bard and in violation of his instructions." So the question comes down, gentlemen, to this: Whether you believe under the evidence that at the time of this transaction Bard had or had not the power to bind the

defendants by this note. If he didn't, then that is an end of the case, and your verdict must be for the defendants. If, however, you conclude that William P. Bard had the power to bind defendants by this note, then there will be a further question to be answered in the affirmative before the plaintiff can recover, viz, Was the note honestly delivered to her?

"You understand, gentlemen, that a note is not binding until or unless it is delivered. So long as a note remains in your hand undelivered it does not bind you. Delivery, however, need not be, in this case, an actual handing over of the note to the plaintiff. A delivery to her attorney, if proved, would be sufficient. But, as you remember, William P. Bard was her attorney, and at the same time the manager of the defendants' firm. Now, he might, in his capacity as manager of the defendants' firm, deliver the note of the firm to himself in his capacity as attorney for the plaintiff. Did he do so? That is the question. You have heard where the note was found. There is probably no doubt upon this point that Bard put it where it was found, but was his putting it there a delivery of the note? That question becomes essentially a question of intent. What did Bard mean by putting the note where it was found? Did he mean that by putting it there it should become the plaintiff's property, and be a binding obligation in her hands against the defendants? That, gentlemen, is the next question which you will have to determine.

If the jury believe that William P. Bard signed the note in question, placed it among the plaintiff's papers in an envelope indorsed with the plaintiff's name, told her that he held the paper for her, and that she could come and get it when she pleased, and if they believe that it was the intention of William P. Bard that the said note should be regarded as having passed from his hands and into the custody of the plaintiff, it will be the duty of the jury to regard the note as having been duly delivered to the plaintiff with the same force and effect as if it had been physically placed in her hands." But you must judge of what William P. Bard intended by what he did, and by all of what he did. You must, therefore, extend your view, gentlemen, to the whole evidence as to what Bard did in the course and as part of this transaction. "If the jury believe that William P. Bard did not regard this note as delivered to the plain-

tiff when he placed it in his vault, but intended that it should be regarded as delivered to the plaintiff only after he should place the $3,000 in the treasury of the company, and that he never did place the $3,000 in the treasury of the company, then the transaction was incomplete and the jury must find for the defendants."

But there must have been not only a delivery, but there must have been an honest delivery; there must have been an honest intention on Bard's part to apply the plaintiff's money to the purposes of the defendants' firm, and to give to plaintiff the obligation of the defendants' firm, for it. The defendants' manager and the plaintiff's attorney were one and the same person. If he meant when he got the plaintiff's money to cheat her, then he never meant to make the defendants liable for it. If at that time he meant to cheat the defendants, then, since the plaintiff is affected by the fraud of her agent, she cannot recover against them. In other words: As William P. Bard was the agent for both parties, if he acted in bad faith in the transaction toward either party, the plaintiff cannot recover. If the jury believe that William P. Bard did not make and deliver this note to the plaintiff in good faith, and that the note does not evidence a real loan of the plaintiff's money made in good faith to the defendants for their use, the jury must find a verdict for the defendants.

Now, gentlemen, what was the state of his mind upon this question at the time the note was put into plaintiff's envelope and when her money was received by him? That question again, gentlemen, you must decide in the light of all the evidence in the case that bears upon it and in the light of all Bard's actions in connection with this transaction. To be sure, if the jury believe that William P. Bard in good faith borrowed the said sum of $3,000 for the defendants' copartnership, that he signed the note in suit therefor, and placed the same in the plaintiff's envelope which was indorsed with her name, and which contained her papers, that it was his intent that the note should be considered delivered to the plaintiff, and if they believe that under the terms of the agreement and the parties' course of dealing thereunder, William P. Bard was empowered at his discretion to borrow money for the firm, and give the firm's notes therefor, the verdict should be for the plaintiff, not

withstanding the defendants' manager after getting the money may have misappropriated it. And if the jury believe that William P. Bard executed the note in question and on the 4th day of October, 1890, or at the time when he received the plaintiff's money, placed the said note in the plaintiff's envelope with her other papers, the presumption is that he did so honestly and this presumption must stand until it is rebutted by testimony.

But, gentlemen, if, in your opinion, the fair preponderance of the evidence in this case leads you to believe that Bard's intention, at the time I have indicated, was dishonest, the presumption of honesty is overcome.

You understand, gentlemen, I am not stating these things to be facts; I am simply saying it is your right and duty to consider the evidence as to these matters as bearing upon the question of honesty of delivery and loan in this case.

Now, gentlemen, that is all I have to say to you. You will take this case and decide it as in right and justice belongs, with fairness towards both parties, without irrelevant sympathy for either. You are here, gentlemen, to administer justice, not benefits or charity.

Defendant's points and answers were among others as follows:

6. In determining whether or not William P. Bard intended to borrow the plaintiff's money in good faith for the defendants and whether he regarded the note as delivered to the plaintiff, the jury may consider the evidence, (1) that during the previous summer, George W. Bard had taken up all the outstanding loans of the partnership, and was not consulted as to the borrowing of any more for the partnership; (2) that William P. Bard made no entry of this loan in the note book of the defendants and did not draw the note on the blank form in the note book following the last note which he had drawn prior to October 1, 1890, but used a blank form apparently taken from the back of the book; (3) that William P. Bard did not inform the plaintiff that he was lending her money to the defendants, but informed her that he was lending it on a mortgage on a house in Fourth street; (4) that William P. Bard did not deposit the money in the defendants' bank account, but deposited it in his attorney's account, where he kept the moneys of his clients for investment and his own moneys, and subsequently used it for

other purposes than the purposes of the firm ; (5) that William P. Bard did not pay the plaintiff her interest from the funds of the firm but by cash and check drawn on his attorney account; (6) that when pressed by the plaintiff in November, 1891, for her papers, William P. Bard from time to time postponed his engagements to deliver her papers to her, and finally disappeared on the last day appointed for the purpose without doing so and was not seen afterwards until his body was found in the Schuylkill river. *Answer :* Affirmed. [1, 2]

3. Even though William P. Bard had originally possessed authority to borrow money for the partnership, without consulting the partners, yet if the jury believe that in the summer of 1890 George W. Bard, one of the partners, informed William P. Bard that he was not willing to be under any liability any longer for money borrowed for the firm and took up all the outstanding loans, then the defendants would not be liable for money borrowed afterwards from the plaintiff through William P. Bard as her attorney, without the knowledge of George W. Bard and in violation of his instructions. *Answer :* Affirmed. [3]

Verdict and judgment for defendants. Plaintiff appealed.

*Errors assigned* were (1–3)above instructions, quoting them; (4) rulings on evidence, quoting the bill of exceptions.

*Cyrus G. Derr*, with him *Daniel H. Wingerd*, for appellant. —To give undue prominence to the testimony on one side of a case, is error: Nieman v. Ward, 1 W. & S. 68 ; Parker v. Donaldson, 6 W. & S. 132; Penna. Canal Co. v. Harris, 101 Pa. 92; Reichenbach v. Ruddach, 127 Pa. 599.

There having been no evidence whatever of George W. Bard, one of the defendants, having prior to the making of the note in suit informed William P. Bard, the defendants' manager, that he, George W., was not willing to be under any liability any longer for money borrowed, it was error to have charged the jury as requested in the defendants' third point, that if the said George W. Bard had so informed the manager, the defendants were not liable upon the note in question, and besides this, if the said George W. Bard had so informed the manager, it was not an abrogation of the manager's power to bind the firm,

because one of the three copartners could not modify the copartnership agreement, and either way the affirmance of the said point was erroneous.

The fact that previous to the inception of the transaction in question, William P. Bard, the defendants' manager, had been the plaintiff's attorney in the matter of the adjudication of her husband's estate in the orphans' court, as well as the amount distributed to the plaintiff by the said orphans' court, was entirely irrelevant to the issues being tried in this case and the admission of such evidence was erroneous: Greenleaf on Evidence, sec. 52.

*Isaac Hiester*, with him *George J. Gross, Jr.*, for appellees.— The charge was not erroneous : Cross v. Tyrone M. & M. Co., 121 Pa. 400 ; Thomas v. Loose, 114 Pa. 48 ; Gheen v. Heyburn, 1 Walker, 148 ; Payne v. Noon, 8 Atl. Rep. 428.

OPINION BY MR. JUSTICE DEAN, October 5, 1896 :

We regret the necessity of sending this case back for retrial. In the late case of Reichenbach v. Ruddach, 127 Pa. 564, some of the cases on the subject of one-sided charges are cited, and our Brother GREEN, on page 600, speaking for the court, uses this language: "We have so frequently held, that giving undue prominence to the testimony of one side of a case is error, that a reference to the cases is unnecessary." Here, the learned judge of the court below took up and referred to no less than six items of evidence adduced by defendants, and prominently presented them to the jury for their consideration in determining the main fact on which the case turned ; there was no error in this, if the evidence on the other side in contradiction had been placed before the jury with the same care, but it was not. Notice the method of this presentation ; the learned judge says : "In determining whether or not William P. Bard intended to borrow the plaintiff's money in good faith for the defendants, and whether he regarded the note as delivered to the plaintiff, the jury may consider the evidence." Then follows the substance of defendants' testimony, relating to the six material facts tending to establish defendants' side of the issue. First is stated the proposition on which the case turns, then all the facts tending to establish defendants' side of it, in the exact language of

defendants' counsel, as he doubtless argued the case to the jury, without indicating that it was other than the language and thought of the court. The plaintiff had given competent evidence tending directly to contradict the evidence of defendants to establish four of the six alleged facts; besides the inferences reasonably to be drawn from the established facts were stoutly and fairly disputed by plaintiff. The learned judge had indicated to the jury in the beginning of the charge the course he intended to pursue, thus: "The evidence adduced in this trial has been explained and discussed to you by counsel in all its bearings, and I shall not attempt to rehearse it to you. . . . I shall confine myself to stating to you the legal rules which it is your duty to apply in your investigations." But at the conclusion of the charge, he most carefully rehearsed the substance of defendants' testimony, without even adverting to plaintiff's which antagonized it. Not to rehearse the evidence on either side, which had been fully explained and discussed by counsel, would have been one mode of impartial instruction; and he had a right to change his mind before the conclusion of the charge, and impartially rehearse the testimony on both sides. But it cannot be said it was impartial to half change his mind and rehearse it only on one side. The frequent declarations to the jury that all the evidence was for their consideration does not cure such instruction. We know, the learned judge of the court below and every lawyer knows how unfavorable may be the impression made upon, generally, untrained thinkers, who must deliberate and form conclusions within a very few hours, by prominently presenting, as the last word to them, only one side of a disputed cause, and this, too, by a judge eminent because of his judicial integrity and ability. Under such circumstances, the probability is, they will assume there is but one side to the case, and that the one to which the court has called their attention specially and at length.

We therefore sustain appellant's first assignment of error, which practically disposes of the second.

The third assignment is as follows:

Even though William P. Bard had originally possessed authority to borrow money for the partnership without consulting the partners, yet if the jury believe that in the summer of 1890 George W. Bard, one of the partners, informed William

P. Bard that he was not willing to be under any liability any longer for money borrowed for the firm, and took up all the outstanding loans, then the defendants would not be liable for money borrowed afterwards from the plaintiff through William P. Bard as her attorney, without the knowledge of George W. Bard and in violation of his instructions. *Answer :* Affirmed. .

We think the unqualified affirmation of this point was probably inadvertent error, but error it clearly is. In the first place, there was no evidence tending to show that George W. Bard, one of the copartners, was not willing longer to be liable for money borrowed by the manager for the partnership, while the point assumes there was. According to his own testimony, he was averse to renewing notes in bank with his indorsement, and he took them up. But this displayed only the usual sagacity of business men who are watchful of their credit. There is nothing tending to show that George W. intended to take from the manager the authority to borrow money elsewhere. Nor, even if he had attempted to expressly revoke the manager's authority, would such attempt have been effective, in view of the agreement and the course of business theretofore pursued, which had been ratified by the partnership. Mere notice by one partner, acting independently of the others, was not sufficient to revoke the long exercised power of the manager; partnership action in some form was indispensable to resolve upon and execute such radical change in conducting the business. This assignment is sustained ; the point should have been denied.

The evidence complained of in the fourth assignment should have been rejected for irrelevancy. The defendants were permitted to offer evidence to prove that William P. Bard was counsel for plaintiff in the adjudication of her father's estate in the orphans' court. It was utterly immaterial whether he was or not, and it could have no legitimate bearing on the question at issue.

For the reasons given, the judgment is reversed and a v. f. d. n. awarded.